**OCCIDENTAL CHEMICAL CORPORATION,**
Plaintiff,

v.

**OHM REMEDIATION SERVICES CORP., Defendant.**

No. 94–CV–959S(H).

United States District Court,
W.D. New York.

June 25, 1997.

James W. Gresens, Gresens & Gillen, Buffalo, NY, for plaintiff.

Robert J. Lane, Jr., Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, Charles M. Reifel, Bastianelli, Brown, Touhey & Kelley, Washington, DC, for defendant.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

This case has been referred to the undersigned by Hon. William M. Skretny for all pretrial matters, including the hearing and disposition of non-dispositive motions, in accordance with 28 U.S.C. § 636(b)(1)(A). Defendant has moved to compel the production of documents as to which plaintiff has assert-

ed attorney-client privilege and/or work product protection. What follows is this court's ruling on certain issues which the parties agree will significantly narrow the discovery dispute addressed by defendant's pending motion.

## BACKGROUND

As discussed in this court's prior decisions, the original complaint in this action was filed on December 30, 1994, and an amended complaint was filed on March 3, 1995. Plaintiff seeks damages for defendant's alleged breach of a written contract for environmental cleanup at the Little Niagara River inlet to the Durez Inactive Hazardous Waste Disposal Site (the "Durez Inlet"). Jurisdiction is based on diversity of citizenship. According to the complaint, the cleanup was mandated by a partial consent judgment approved by Hon. John T. Curtin in *State of New York v. Occidental Petroleum*, 83–CV–552C (W.D.N.Y. (Third Consent Judgment and Order, dated October 21, 1993)). Plaintiff alleges that on October 6, 1993, the parties executed a written contract which provided that defendant would complete its work on the remediation project by May 27, 1994. Plaintiff alleges that defendant's performance of the work was late and incomplete, causing plaintiff to incur damages in the amount of over $8.8 million.

On April 6, 1995, defendant filed its answer to the amended complaint and asserted several counterclaims. The counterclaims seeks over $9 million in damages for breach of contract and warranty, based on the claim that plaintiff misrepresented or failed to disclose material conditions, characteristics and specifications of the work to be performed at the Durez Inlet (Item 6). On July 18, 1995, plaintiff filed its reply to defendant's counterclaims (Item 13). The parties have engaged in extensive discovery during the course of this litigation, and the court has issued several rulings and amended scheduling orders.

The current discovery dispute involves defendant's request for production of documents which was served on July 24, 1995. In response to this request, plaintiff produced numerous documents and withheld numerous others as to which it asserted attorney-client privilege or work product protection. After the exchange of privilege and objection logs, and after meetings between counsel, oral argument of defendant's motion to compel was heard by the undersigned on May 23, May 30, and June 11, 1997. The parties agree that the current dispute will be significantly narrowed by a decision from this court on the following issues:

1. Whether documents sent to or prepared by Rust Environment and Infrastructure, Inc. ("Rust") (formerly, Dunn Geoscience Corp. ("Dunn")) during the performance of its duties as plaintiff's consulting engineer for the Durez Inlet project (*i.e.*, documents dated from approximately late 1992 through April, 1995; *see* Item 94), are protected from disclosure as material prepared in anticipation of litigation under Rule 26(b)(3) of the Federal Rules of Civil Procedure.

2. Whether Rust documents generated during the performance of Rust's duties as plaintiff's engineering consultant for the design of the Durez site remediation plan (*i.e.*, documents dated from approximately July, 1990 through June, 1992; *see* Item 86, Ex. A), are protected from disclosure by the attorney-client privilege.

3. The date on which plaintiff reasonably anticipated that litigation with defendant over the Durez Inlet project was imminent.

## DISCUSSION

**I. Documents Pertaining to Rust's Work as Consultant During the Durez Inlet Project: Material Prepared in Anticipation of Litigation.**

According to plaintiff's counsel, Rust was originally retained under an agreement with plaintiff's former outside counsel, Whiteman, Osterman & Hanna, to be the engineering consultant for design and development of the cleanup of the Durez site, including the Durez Inlet project. Rust was subsequently retained by plaintiff, under a separate agreement, to be the engineering consultant for the actual performance of the work on the

Durez Inlet project. Neither retainer agreement has been provided to the court, and the motion papers do not otherwise specify the scope of Rust's duties as consultant on either the design phase or the project phase, or the intent of the parties to those agreements as to the confidentiality of the information exchanged or documents produced.

Plaintiff claims that documents dated from approximately late 1992 through April, 1995 pertaining to Rust's performance of its duties as engineering consultant for the Durez Inlet project phase are protected from disclosure as material prepared in anticipation of litigation under Fed.R.Civ.P. 26(b)(3). That rule provides, in relevant part:

> [A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Fed.R.Civ.P. 26(b)(3). The rule derives from the "attorney work product" doctrine, as explained in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), which immunizes from discovery certain material gathered by attorneys for the purposes of litigation.

In determining whether this qualified protection applies, the initial inquiry is "whether, in light of the nature of the documents and the factual situation in a particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation." *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 125 F.R.D. 51,54 (S.D.N.Y.1989). The protection from disclosure offered by Rule 26(b)(3) "requires a more immediate showing than the remote possibility of litigation." *Garfinkle v. Arcata Nat. Corp.*, 64 F.R.D. 688, 690 (S.D.N.Y.1974). "Litigation must at least be a real possibility at the time of preparation or, in other words, the document must be prepared with an eye to some specific litigation." *James Julian, Inc. v. Raytheon Co.*, 93 F.R.D. 138, 143 (D.Del.1982).

Once established, work product immunity extends to documents prepared by or for a representative of a party, including his or her agent. See 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2024, at 205–206. As the Supreme Court stated in *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975):

> At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he [or she] can analyze and prepare his [or her] client's case. But the doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

*Id.* at 238–39, 95 S.Ct. at 2170 (quoted in *In re Grand Jury Matter*, 147 F.R.D. 82, 87 (E.D.Pa.1992)).

Both parties rely on the *In re Grand Jury Matter* case to support their positions with respect to the application of the work product doctrine to the Rust documents generated while Rust was acting as plaintiff's environmental consultant for the Durez Inlet project. In the *In re Grand Jury Matter* case, a company which was the subject of a federal grand jury investigation for criminal violations of the environmental laws sought to quash a subpoena issued to its environmental consultant calling for the production of all documents in the consultant's possession with respect to the company's waste handling and disposal practices. At the direction of the company, the consultant withheld certain documents as to which the company asserted attorney-client privilege or work product protection. The company claimed that it hired a law firm to provide it with legal advice in connection with prior

proceedings involving the state Department of Environmental Resources, and that the law firm in turn retained the consultant to provide the law firm with environmental consulting services in order for the law firm to render legal advice to the company.

The court reviewed the documents *in camera*, and "found no document which was intended to assist the law firm in providing legal advice to the company." *In re Grand Jury Matter, supra*, 147 F.R.D. at 87. The court stated:

> The documents include memorializations of interviews with company employees with respect to waste handling procedures, as well as observations and impressions made after witnessing first-hand the procedures and company facilities, and after reviewing internal company documents detailing the procedures. It is obvious that the documentation of these activities by the expert consultant was made for the purpose of the expert consultant's preparation of a waste management plan for submission to the federal and Commonwealth authorities, and not for the purpose of assisting the law firm in providing informed legal advice.

*Id.*

In this case, as mentioned above, no information has been provided to the court with respect to the scope or intent of Rust's retention by plaintiff as the engineering consultant for the project. In addition, the information in the privilege and objection logs indicates that the Rust documents dated from late 1992 through April, 1995 contain handwritten notes, draft letters, memoranda, diagrams, maps and other materials prepared by and transmitted to engineers, managers, scientists or other non-attorney employees of plaintiff and Rust (see Item 94, Tabs 1 & 5). Plaintiff has therefore failed to establish, as an initial matter, that Rust was hired for the project to assist its counsel in providing legal advice, or that any of the documents were generated for that purpose.

■ Under Fed.R.Civ.P. 26(b)(3), material prepared by non-attorneys, even if prepared in anticipation of litigation, is protected from discovery "only where the material is prepared exclusively and in specific response to imminent litigation." *Snyder v. Winter*, 159 F.R.D. 14, 15 (W.D.N.Y.1994). "Documents which do not refer to work product prepared by an attorney or other agent of a party to aid in forthcoming litigation, and which were generated in the ordinary course of business, are discoverable." *Allendale Mut. Ins. v. Bull Data Systems*, 152 F.R.D. 132, 136 (N.D.Ill.1993). Accordingly, if a party or its attorney "prepares a document in the ordinary course of business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." *Martin v. Valley Nat'l Bank*, 140 F.R.D. 291, 304 (S.D.N.Y.1991); *see also Redvanly v. NYNEX Corp.*, 152 F.R.D. 460 (S.D.N.Y.1993).

In this case, the information contained in the privilege and objection logs indicates that the Rust documents dated from late 1992 through April, 1995 were prepared contemporaneously with the problems that arose during defendant's performance of the remedial work in the Durez Inlet. Even if these documents were prepared with an eye toward litigation, it is indisputable that the documents also contain information which plaintiff would be expected to obtain or compile in the ordinary course of its business of overseeing the performance of environmental remediation work under its contract with defendant.

■ In addition, when a party takes a position in a case that places at issue the very information sought to be protected from disclosure by the work product doctrine, the protection may be waived. *Vermont Gas Systems v. United States Fidelity & Guaranty Co.*, 151 F.R.D. 268, 276 (D.Vt.1993); *Remington Arms Co. v. Liberty Mutual Ins. Co.*, 142 F.R.D. 408, 412 (D.Del.1992)("at issue" doctrine stems from traditional notions of waiver). In this case, there can be no question that when it brought this action for contractual damages stemming from defendant's performance of the Durez Inlet remediation work, plaintiff placed at issue the information contained in the Rust documents with respect to the site conditions during the project.

Accordingly, I find that plaintiff has failed to establish work product protection for the Rust documents generated during Rust's performance of its duties as engineering consultant for the Durez Inlet project. This ruling pertains not only to the scientific engineering data or other purely factual information contained in those documents, but also to any "statements .... mental impressions, [or] personal beliefs ..." expressed in handwritten notes, drafts, memoranda or other tangible materials. *Hickman v. Taylor, supra,* 329 U.S. at 511, 67 S.Ct. at 393–94; *see also In re Grand Jury Matter, supra,* 147 F.R.D. at 86–87.

## II. Documents Pertaining to Rust's Work as Design Consultant: Attorney–Client Privilege.

■ Plaintiff has submitted the affidavit of John Gansfuss, Senior Consultant for Rust, in which he states that he has been "involved with the Durez Inlet Remediation Site and other portions of the Durez Plant work since 1986" (Item 86, ¶ 4). The list attached to Mr. Gansfuss's affidavit identifies 45 documents, dated from July 19, 1990 through June 10, 1992. No date is provided for some of the documents listed. According to Mr. Gansfuss, "[t]hese documents were prepared after Occidental had been sued by the [New York State Department of Environmental Conservation ("DEC") ](presumably, in the *State of New York v. Occidental Petroleum* case cited above, which was filed on May 24, 1983) and we were in the midst of negotiations and strategic discussions as to what needed to be done to settle the matter and as to Occidental's position toward the DEC" *(id.,* ¶ 5). At that point in time, Rust had been retained by plaintiff's former outside counsel to design the cleanup of the Durez site.

■ Plaintiff claims that these documents are protected from disclosure by the attorney-client privilege. The attorney-client privilege protects "confidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). The privilege attaches:

(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived. *In Re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1036 (2d Cir.1984). The burden of proving each element of the privilege rests on the party claiming protection. *In re Horowitz,* 482 F.2d 72, 82 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973); *United States Postal Service v. Phelps Dodge Refining Corp.,* 852 F.Supp. 156, 159 (E.D.N.Y.1994); *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 145 F.R.D. 298, 301 (E.D.N.Y.1992).

■ The attorney-client privilege may cover "communications made to agents of an attorney ... hired to assist in the rendition of legal services." *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991). Thus, "the attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client." *Federal Trade Commission v. TRW, Inc.,* 628 F.2d 207, 212 (D.C.Cir.1980)(citing *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961)).

The *Kovel* court "analogized the role of the accountant to that of a translator who puts the client's information into terms that the attorney can use effectively." *Id.* As explained in the *Phelps Dodge* case, the application of the privilege in *Kovel* is now recognized as extending to representatives of the attorney such as accountants, administrative practitioners not admitted to the bar (such as patent agents employed by patent attorneys), and non-testifying experts. *United States Postal Service v. Phelps Dodge, supra,* 852 F.Supp. at 161 (citing 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 503(a)(3)[01] at 503–31 to 38 (1993); Edward M. Spiro & Caroline Rule, *'Kovel' Experts Cloaked by Attorney–Client Privilege,* N.Y.L.J., Feb. 22, 1994, at § 1, § 10 (privi-

lege has been applied to "communications with a psychiatrist assisting a lawyer in forming a defense, a bail bondsman, and a polygraph operator")).

Based on the information provided by plaintiff in the affidavits, exhibits and memoranda submitted in opposition to defendant's motion to compel, I find that plaintiff has failed to demonstrate how Rust falls within any of these recognized categories of representatives or agents for the purpose of applying the attorney-client privilege. Rust cannot be characterized as an "administrative practitioner" since it was not employed by plaintiff's attorneys specifically to assist them in rendering legal advice. In fact, the available information suggests that, like the environmental consultants in the *Phelps Dodge* case, Rust was hired by plaintiff's former counsel to formulate a remediation plan for the Durez site acceptable to the DEC. Rust's function "was not to put information gained from [plaintiff] into usable form for [its] attorneys to render legal advice, but rather, to collect information not obtainable directly from [plaintiff]." *Phelps Dodge, supra.*

Nor could Rust be characterized as a nontestifying expert. Rust has not been identified by plaintiff as an expert witness in this case, and it is not disputed that Rust employees will testify as fact witnesses based on their observations as engineering consultants for the Durez Inlet project. In fact, extensive depositions of Rust employees have already been conducted, and plaintiff has disclosed numerous documents generated by Rust in performing its engineering services.

Additionally, and as noted in *Phelps Dodge*, courts that have considered whether to apply the attorney-client privilege to communications or other documents involving independent outside consultants "have been cautious in extending its application." *Phelps Dodge, supra* (citing *Federal Trade Commission v. TRW, Inc., supra,* 628 F.2d at 212). As stated in the *TRW* case:

> Where, as here, we have not been provided with sufficient facts to state with reasonable certainty that the privilege applies, [the burden of establishing the privilege] is not met.... TRW's claim lies at an outer

and indistinct boundary of the law of attorney-client privilege. Particularly where this is so, it is our responsibility to tread carefully, with as much precision as the facts before us permit.

*TRW, supra,* 628 F.2d at 212.

Plaintiff's claim of attorney-client privilege with respect to the Rust documents generated during Rust's performance of its duties as design consultant for the Durez cleanup goes well beyond the "outer and indistinct boundary" of the privilege. Even though the information submitted on this motion does not allow a determination of the precise scope of Rust's work as design consultant, it is clear to the court that the work performed by Rust served purposes other than to assist plaintiff's attorneys in litigation. It is not disputed that the assistance rendered by Rust was based on factual and scientific evidence obtained through studies and observation of the physical condition of the Durez site, and not through client confidences. As stated by the court in *Phelps Dodge:*

> Such underlying factual data can never be protected by the attorney-client privilege and neither can the resulting opinions and recommendations. There are few, if any, conceivable circumstances where a scientist or engineer employed to gather data should be considered an agent within the scope of the privilege since the information collected will generally be factual, obtained from sources other than the client.

*Phelps Dodge, supra,* 852 F.Supp. at 162.

Plaintiff argues that most of the Rust documents have been produced, and that plaintiff has withheld only a small number of documents which note legal opinions and strategic considerations stemming from counsel. Plaintiff argues that the latter are protected due to the nature of their subject matter. But this argument begs the question. The application of the attorney-client privilege must be based on the relationship between the consultant, the client and the attorney, not on the specific content of individual communications. If Rust was not performing the function of an agent "hired to assist in the rendition of legal services ...," *United States v. Schwimmer, supra,* 892

F.2d at 243, then communications to or from Rust would not be privileged, regardless of the content of the communications.

Accordingly, I find that plaintiff has failed to establish that the Rust documents pertaining to Rust's performance of its duties as plaintiff's design consultant for the Durez cleanup are protected from disclosure by the attorney-client privilege.

### III. Date of Imminent Litigation.

 Aside from the Rust documents, plaintiff has withheld numerous other documents which it claims were prepared in anticipation of litigation. Plaintiff contends that it anticipated litigation of this matter "as early as February 1994" (Item 89, ¶ 42). More specifically, plaintiff contends that it anticipated litigation when it received a letter from defendant dated March 16, 1994. In that letter, defendant notified plaintiff that it was making a claim for additional payments on the contract based on differing site conditions. This was approximately 9 months before plaintiff filed the complaint in this action on December 30, 1994.

The March 16, 1994 letter has not been identified by the parties in their motion papers as an exhibit to any of the affidavits on file with the court. In fact, the earliest correspondence submitted with the motion papers from which a determination of the parties' anticipation of litigation can be made is a June 24, 1994 letter from Joseph Coveney, plaintiff's Project Engineer, to Herff Gazaway, defendant's Project Manager (Item 89, Ex. G). In that letter, Mr. Coveney indicated certain problems with the project and requested written explanation "of steps which will be taken by OHM" to assure no further delays in completion of the work under the contract (*id.*).

The next chronological exhibit attached to plaintiff's papers is a letter dated August 10, 1994 from Gazaway to Coveney (*id.*). In that letter Gazaway discusses the movement of sheet piles surrounding the "LWL [Lockport Waterline] slot." The movement was first observed in July, 1994, at which time work was suspended in the LWL slot area. Gazaway's August 10, 1994 letter stated:

[W]e have grave concerns regarding stability and safety of the sheets and OCC's general design approach regarding sheet lengths. These must be resolved prior to the resumption of work in the slot. Since this item is on the critical path, we will be ceasing all non-critical job site activities at the end of shift today in order to mitigate impact and delay costs to you. We will maintain only security, fire watch, and water treatment functions until work in the slot can be resumed.

(*Id.*).

Subsequent correspondence between Gazaway and Coveney resulted in a three-page letter dated August 17, 1994 from Coveney to Gazaway detailing "repeated and lengthy delays resulting from unilateral actions by OHM," as well as the problems with the LWL slot pilings, and directing defendant to resume work on the project by August 22, 1994 (*id.*). Gazaway responded on August 19, 1994, advising Coveney that defendant had retained an engineering firm "to evaluate the situation and make recommendations" (*id.*).

On September 27, 1994, James Havas, plaintiff's Project Manager, sent Gazaway a certified letter summarizing the contractual relationship between the parties and detailing the "major delays, slowdowns and interruptions in the orderly execution of the contract scope of work" (*id.*). The letter continued:

If OCC does not receive written confirmation from OHM by 12:00 noon on Friday, September 30, 1994 that OHM will recommence work by Wednesday, October 5, 1994, OCC will take whatever steps necessary to supplement the OHM contract to complete the work in as expeditious a manner as possible with the costs to do so for OHM's account.

(*Id.*). Gazaway responded in a letter dated September 29, 1994, in which he stated that OHM was "not in a position" to provide plaintiff with the written confirmation it had requested. Instead, Gazaway detailed defendant's position as to the various contractual disputes that had developed between the parties, and proposed "an immediate ADR procedure ... for the purpose of resolving the

LWL slot design dispute and completing the project in the most economical and expeditions manner" (*id.*).

No further correspondence is attached to the motion papers. However, according Thomas Leach, plaintiff's site representative for the project, on October 11, 1994 plaintiff issued a change order to the contract "which deleted any remediation work from OHM's contract based on the outstanding contract amounts" (*id.*).

Based on this information, I find that litigation was imminent as of plaintiff's virtual termination of the contract on October 11, 1994. The correspondence between the parties indicates that, as late as September 29, 1994, both plaintiff and defendant anticipated either continued performance of the contract or alternative dispute resolution. As stated in *Garfinkle v. Arcata Nat. Corp., supra,* "the work product immunity requires a more immediate showing than the remote possibility of litigation," and that showing is not made merely because " 'the prospect of litigation is identifiable because of specific claims that have already arisen.' " 64 F.R.D. at 690 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 47 F.R.D. 334, 337 (S.D.N.Y.1969)); *see also Grossman v. Schwarz,* 125 F.R.D. 376, 389 (S.D.N.Y. 1989).

### CONCLUSION

Based on the foregoing, the court makes the following rulings:

1. Plaintiff has failed to establish that the Rust documents pertaining to Rust's performance of its duties as plaintiff's engineering consultant for the Durez Inlet project are protected from disclosure as material prepared in anticipation of litigation.

2. Plaintiff has failed to establish that the Rust documents pertaining to Rust's performance of its duties as plaintiff's design consultant for the Durez site cleanup are protected from disclosure by the attorney-client privilege.

3. Litigation of this matter was imminent as of October 11, 1994.

**SO ORDERED.**